UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

KRISTEN A. ELLSWORTH; and
JEFFREY R. KIMBLE,

                        Plaintiffs,

   -against-                                      1:11-CV-0381(LEK/CFH)

DONNA WACHTEL,

                        Defendant.

### MEMORANDUM-DECISION and ORDER

**I.    INTRODUCTION**

On April 6, 2011, Plaintiffs Kristen A. Ellsworth and Jeffrey R. Kimble (collectively, "Plaintiffs") filed a civil rights Complaint pursuant to 42 U.S.C. § 1983. Dkt. No. 1 ("Complaint"). Presently before the Court is a Motion for summary judgment filed by Defendant Donna Wachtel ("Defendant") on May 4, 2012. Dkt. No. 15 ("Motion"). Plaintiffs filed a Response in opposition to this Motion on June 3, 2012, and Defendant filed a Reply to the Response on July 3, 2012. Dkt. Nos. 19 ("Response"), 20 ("Reply").[1]

**II.    BACKGROUND**

The allegations that form the basis for this case arise from an encounter between Plaintiffs

---

[1] In lieu of a memorandum of law, Defendant filed as her Reply a "Reply Affidavit." The Affidavit purports to "specifically address the arguments set forth by John A. DeGasperis, Esq. in his attorney's affirmation in opposition to defendant's motion for summary judgment." Id. ¶ 3. The Reply (and the argumentative portions of Mr. DeGasperis's affidavit) clearly violate Local Rule 7.1(a)(2), which provides that "[a]n affidavit must not contain legal arguments but must contain factual and procedural background that is relevant to the motion the affidavit supports." Therefore, the Court declines to consider any such improper argumentation contained in the Affidavits. See Oneida Indian Nation v. Cnty. of Oneida, 802 F. Supp. 2d 395, 425 n.24 (N.D.N.Y. 2011) (refusing, under Local Rule 7.1(a)(2), to consider the legal arguments contained in affidavits submitted to the court).

and Defendant just after midnight on August 14, 2010 in Kingston, New York. Compl. ¶ 9. On the night of August 13, 2010, Plaintiffs visited the apartment house of an acquaintance, Wayne Oates ("Oates"),[2] located at 607 Abeel Street in Kingston. Plaintiff's Statement of material facts (Dkt. No. 19-17) ("Pl.'s S.M.F.") ¶ 39. Plaintiffs and Oates spent between one and two hours at Oates's home, conversing over tea and coffee. See Dkt. No. 19-8 at 20-23. At some point, Oates made a telephone call and then asked if Plaintiffs would give him a ride to his girlfriend's house. Id. at 22; Pl.'s S.M.F. ¶ 39. Plaintiffs agreed, and Plaintiff Kimble drove Oates and Plaintiff Ellsworth to another house, returning to 607 Abeel Street around midnight. Pl.'s S.M.F. ¶¶ 40-42. When they returned, Plaintiff Kimble parked the car in the driveway, all three got out of the car, and they walked toward the rear entrance of the apartment. Id. ¶ 42.

On the same August 2010 night, Defendant, a City of Kingston police officer, was on patrol with New York State Trooper Joshua Taylor ("Taylor"). Defendant's Statement of material facts (Dkt. No. 15-8) ("Def.'s S.M.F.") ¶¶ 5-8. Defendant and Taylor were assigned to a special program called the "Blue and Gray Program" wherein uniformed patrol officers from the City of Kingston worked together with officers from the New York State Police Department in a joint police program known as "IMPACT." Id. ¶¶ 7-8.

---

[2] Some uncertainty persists as to Oates's first name and his criminal history. Defendant identifies the house at 607 Abeel Street as belonging to a "Randolph Oates" and states that she was familiar with him because of prior calls to this address and because he "had been arrested for dealing in illegal narcotics during prior raids at the premises." Defendant's Statement of material facts (Dkt. No. 15-8) ("Def.'s S.M.F.") ¶¶ 13-14. Both Plaintiffs, however, claim to know Oates as "Wayne Oates." See, e.g., Dkt. Nos. 15-7 at 22-23, 15-8 at 19. Based on the various deposition transcripts offered in support of and in opposition to the Motion, it is not clear to the Court whether Wayne and Randolph Oates are one and the same. The question of Oates's identity does not appear to have any bearing on the substantive issues in this case and – as a result – is not the sort of "genuine issue of material fact" that might defeat this Motion. Nevertheless, the Court notes this discrepancy between the parties' accounts.

When Defendant began her shift on August 13, 2010, she was aware that there was an outstanding arrest warrant for an individual named Jessica Wiand ("Wiand"). Id. ¶ 9. Further, during the course of her shift, Defendant received information from a confidential informant that Wiand was at 607 Abeel Street. Id. ¶ 10. Defendant had prior experiences with this address based on prior drug activity and drug arrests that had occurred there.[3] Id. ¶¶ 12-13.

Shortly after midnight on August 14, 2010, Defendant and Taylor arrived in front of 607 Abeel Street in their police vehicle. Id. ¶ 14. The two officers saw a car parked in the driveway and saw three individuals – two men and one woman – exit the vehicle. Id.

At this point in the night, the parties' accounts of what transpired begin to diverge. In order to tease out any potential issues of material fact that might make a grant of summary judgment inappropriate, therefore, the Court recounts both Plaintiffs' and Defendant's versions.

**A. Defendant's Account**

According to Defendant, Taylor exited the police car as soon as he saw Plaintiffs and Oates emerge from their car and yelled "Stop, police." Id. ¶ 15. "[I]mmediately after State Trooper Taylor yelled 'Stop, police', the three individuals ran towards the rear of the premises followed by" the officers. Id. ¶ 16. The three individuals stopped at the back door of the house, at which point it appeared to Taylor that they were trying to flee through a door that happened to be locked. Id. ¶ 19. After Plaintiffs and Oates saw Taylor, they had "a little deer in the headlight look, like, oh, gosh, cops." Id. ¶ 20.

When they confronted Plaintiffs and Oates, Defendant and Taylor saw heroin scattered on

---

[3] As discussed *supra*, this prior experience stemmed from police activity relating to Randolph Oates. Def.'s S.M.F. ¶¶ 13-14; see *supra* note 2.

3

the ground "in close proximity to each of the individuals." Id. ¶¶ 17-18. At this point, the officers detained Plaintiffs and Oates. Id. ¶ 21. The drugs were field tested and positively identified as heroin, but none of the three individuals acknowledged ownership of the drugs. Id. ¶¶ 23-24. Plaintiffs and Oates were each placed under arrest for possession of a controlled substance. Id. ¶ 24. Defendant conducted a pat-down search of the Plaintiff Ellsworth, placed handcuffs on her, and transported her to the Kingston Police Station. Id. ¶ 25. Taylor, meanwhile, conducted a pat-down search of the two males, placed handcuffs on them, and arranged for their transportation to the Kingston Police Department. Id. ¶ 26.

Once at the station, Defendant obtained permission from her supervisor, Sergeant Scanlon, to conduct a strip search of Plaintiff Ellsworth. Id. ¶ 28. Defendant subsequently strip-searched Plaintiff Ellsworth. Id. ¶ 29. During the course of the search, Defendant never touched Plaintiff Ellsworth, but instead instructed her to remove her clothes. Id. ¶¶ 29-30. Taylor handled the arrest and processing of Plaintiff Kimble, in which Defendant took no part. Id. ¶¶ 31-32.

**B. Plaintiffs' Account**

According to Plaintiffs, when they arrived back at 607 Abeel Street, they parked the car in the driveway, got out of the car, and walked toward the rear entrance of the apartment. Pl.'s S.M.F. ¶ 42. At this point, Plaintiffs observed neither other vehicles in the driveway nor any other person in the driveway or on the street in front of the house. Id. ¶ 43.

As they approached the rear of the apartment, both Plaintiffs heard someone say "stop." Id. ¶ 44. Plaintiff Ellsworth looked over her right shoulder and then over her left shoulder to determine where the noise came from, but she did not see anyone. Id. ¶ 45. Plaintiffs continued to walk "only a short distance" before they heard a male voice say, "Stop, police," at which point they both

4

stopped and turned around to see police officers walking up the driveway. Id. ¶ 46. Plaintiffs and Oates did not run after the command was issued, and at this point they had not reached the rear doorway or opened the door. Id. ¶¶ 47-48.

The two officers approached Plaintiffs and Oates, and Defendant stated that "[w]e have a warrant for Jessica Wiand." Id. ¶ 50. At this point, the officers instructed Plaintiffs and Oates to produce personal identification. Id. ¶ 51. Plaintiff Ellsworth handed her personal identification to Taylor, who took the ID back to the squad car. Id. ¶ 52. No narcotics had been found at the scene yet, and Plaintiff Kimble overheard Defendant tell another officer that Plaintiff Ellsworth did not fit the description of the individual identified in the warrant. Id. ¶ 53. Nevertheless, Defendant conducted a pat-down search of Plaintiff Ellsworth. Id. ¶ 54. Over the course of her pat-down search and her search of Plaintiff Ellsworth's purse, Defendant did not discover any drugs or weapons. Id. ¶¶ 54-55. One of the officers then searched Plaintiffs' car and found no contraband. Id. ¶ 56. After the vehicle search, one of the officers opened the outer door to the rear apartment and said that he had discovered an illegal substance between the outer screen door and inner door. Id. ¶ 57. Oates and Plaintiffs denied ownership of the substance. Id. ¶ 58.

On the ride to the Kingston Police station, Defendant continued to question Plaintiff Ellsworth about the drugs and to inquire whether Plaintiff Ellsworth had any drugs on her person. Id. ¶ 60. Plaintiff Ellsworth continued to deny that she was in possession of any illegal substances, but Defendant stated that Plaintiff Ellsworth would be subjected to a strip search when they arrived at the station. Id. ¶¶ 61-63. Once inside the station, Defendant performed a strip search of Plaintiff Ellsworth. Id. ¶¶ 64-65.

Plaintiffs were arrested for and charged with the misdemeanor offense of "Criminal Possession of a Controlled Substance in the Seventh Degree" in violation of Penal Law § 220.02. Id. ¶ 66. The misdemeanor information for both Plaintiffs stated that "defendant did stand near the apartment doorway where three decks of a substance where [sic] located and field tested positive for heroin." Id. ¶¶ 68-69. The criminal charges against both Plaintiffs were eventually dismissed on the merits in January 2011. Id. ¶ 70.

Based on these allegations, Plaintiff Ellsworth alleges that she was subjected to: (1) false arrest; (2) malicious prosecution; and (3) an unreasonable search, all in violation of her constitutional rights. See generally Compl. Plaintiff Kimble asserts causes of action for (1) false arrest and (2) malicious prosecution in violation of his constitutional rights. See generally id.

## III.  STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure instructs a court to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Although "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991).

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of a material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). However, if the moving party has shown that there is no genuine dispute as to any

material fact, the burden shifts to the non-moving party to demonstrate "the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id.  This requires the non-moving party to do "more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Corp., 475 U.S. 574, 586 (1986).

At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 742 (2d Cir. 1998).  A court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them."  Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV. DISCUSSION

In her Memorandum of law in support of her Motion to dismiss, Defendant raises five primary arguments why the Court should grant summary judgment in her favor.  Defendant contends that: (1) the strip search of Plaintiff Ellsworth was lawful because there was reasonable suspicion that she was carrying contraband; (2) Defendant possessed probable cause to arrest Plaintiffs, therefore eliminating any basis for a false arrest claim; (3) Plaintiffs have failed to satisfy the elements of a malicious prosecution claim; (4) Defendant should be shielded by qualified immunity; and (5) Plaintiff Kimble has failed to allege any personal involvement on the part of Defendant, therefore barring his claims.  See generally Defendant's Memorandum of law (Dkt. No. 15-9) ("Def.'s Mem.").  The Court addresses each of these arguments in turn.

### A. Strip Search

"To state a claim under Section 1983, a plaintiff must show: '(1) actions taken under color of

law; (2) deprivation of a constitutional or statutory right; (3) causation, [and]; (4) damages .'" Rahman v. Fisher, 607 F. Supp. 2d 580, 584 (S.D.N.Y. 2009) (quoting Roe v. City of Waterbury, 542 F.3d 31, 36 (2d Cir. 2008)). Defendant has raised no argument in her Motion regarding causation, damages, or the "under color of state law requirements," so the Court only addresses whether the strip search of Plaintiff Ellsworth constituted a deprivation of a constitutional right.

As a preliminary matter, the Court notes that the law regarding the constitutionality of strip searches is in a state of substantial flux. Until recently, Second Circuit case law on the rights of arrestees to be free from strip searches under the Fourth Amendment was well settled. Longstanding precedent dictated that "[t]he Fourth Amendment requires an individualized 'reasonable suspicion that [a misdemeanor] arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest' before she may be lawfully subjected to a strip search." Hartline v. Gallo, 546 F.3d 95, 100 (2d Cir. 2008) (quoting Weber v. Dell, 804 F.2d 796, 802 (2d Cir. 1986)); see also N.G. v. Connecticut, 382 F.3d 225, 232 (2d Cir. 2004) (noting that all circuits to consider issue have reached similar conclusion). "A reasonable suspicion of wrongdoing is something stronger than a mere hunch, but something weaker than probable cause." Varrone v. Bilotti, 123 F.3d 75, 79 (2d Cir. 1997) (internal quotation marks and citations omitted). "To establish reasonable suspicion, [an officer] must point to specific objective facts and rational inferences that they are entitled to draw from those facts in light of their experience. The standard requires individualized suspicion, specifically directed to the person who is targeted for the strip search." Id. (internal quotation marks and citations omitted).

The determination of whether a given strip search is constitutional "turns on an objective

assessment of the . . . facts and circumstances confronting [the searching officer] at the time, and not on the officer's actual state of mind at the time of the search." Hartline, 546 F.3d at 100 (quoting Maryland v. Macon, 472 U.S. 463, 470-71 (1985); citing Simms v. Village of Albion, N.Y., 115 F.3d 1098, 1108 (2d Cir. 1997)) (internal quotation marks and citations omitted). "Factors which may be taken into account in determining the issue of [the] reasonableness" of a search, include:

> (1) excessive nervousness; (2) unusual conduct; (3) an informant's tip; (4) computerized information showing pertinent criminal propensities; (5) loose-fitting or bulky clothing; (6) an itinerary suggestive of wrongdoing; (7) discovery of incriminating matter during routine searches; (8) lack of employment or a claim of self-employment; (9) needle marks or other indications of drug addiction; (10) information derived from the search or conduct of a traveling companion; (11) inadequate luggage; and (12) evasive or contradictory answers.

Id. (citing United States v. Asbury, 586 F.2d 973, 976-77 (2d Cir. 1978)).

The Second Circuit has also held that a "'special needs' standard applied to policies providing for routine strip searches in penal and other institutions housing large, dangerous, or vulnerable populations where introduction of secreted contraband from the outside raises a substantial risk of harm." Id. at 102 n.5 (citing N.G. v. Connecticut, 382 F.3d 225, 234-37 (2d Cir. 2004); Covino v. Patrissi, 967 F.2d 73, 76-80 (2d Cir.1992)). But "[n]o such special needs exist where . . . an arrestee is taken to an empty cell for purposes of an evidentiary search, subsequent booking, and release." Id.

However, the Supreme Court has recently weighed in on the Fourth Amendment implications of strip searches in Florence v. Board of Chosen Freeholders of County of Burlington, 132 S. Ct. 1510 (2012). In Florence, the Supreme Court held that officials may strip search any arrestee before admitting her to jail, even absent any reasonable suspicion. See generally id. The Majority in Florence (along with both Concurrences and the Dissent) emphasized that this was a narrow holding and that the rule announced therein might not apply to arrestees who were not going

to be introduced to the general jail or prison population.  Id. at 1523, 1523 (Roberts, J., concurring), 1524-25 (Alito, J., concurring), 1531-32 (Breyer, J., dissenting).

It is not clear how much Florence alters the landscape of Second Circuit Fourth Amendment precedent, and the Second Circuit has yet to announce the impact (if any) Florence has on the individualized suspicion requirement.  Absent any clear Second Circuit directive, however, the Court concludes that Florence is inapposite to the case at bar and does not govern the Court's analysis of Defendant's strip search of Plaintiff Ellsworth.  Plaintiff Ellsworth was not searched prior to her introduction into a general jail population, and therefore falls under the exception to the rule in Florence.[4]  Id. at 1523.

To determine if the strip search of Plaintiff Ellsworth were reasonable, then, the Court looks to the factors articulated by the Second Circuit in Asbury, 586 F.2d at 976-77.  The only factors that the Court finds applicable here are: "discovery of incriminating matter during routine searches," as there is no question that Defendant found heroin near Plaintiff Ellsworth; and "itinerary suggestive of wrongdoing," based on the alleged history of drug activity at 607 Abeel Street.[5]  The Court concludes that based on these facts alone it cannot find the strip search reasonable as a matter of law.

In reaching this decision, the Court finds the Second Circuit's decision in Hartline to weigh

---

[4] The Court also notes that – because the Second Circuit already recognizes a "special needs" standard in the prison context – the Florence rule should leave untouched the Second Circuit's individualized suspicion requirement in the case of non-custodial searches.

[5] While Taylor testified that Plaintiffs had "a little deer in the headlight look, like, oh, gosh, cops" when they saw him, Def.'s S.M.F. ¶ 20, the Court does not find this to constitute "excessive nervousness."  To the extent the Court were to credit this testimony, the Court is skeptical that any law-abiding citizen would not be at least a little taken aback or unsettled if she were approached from behind by and shouted at by a police officer in the dark of night.

10

heavily against a finding that the search did not violate Plaintiff Ellsworth's rights.  In Hartline, the plaintiff had been arrested after an officer found marijuana in her car during a traffic stop.  546 F.3d 95.  The plaintiff was subsequently arrested and strip searched and brought a § 1983 claim against, *inter alia*, the arresting officer.  The Hartline court found that the strip search was not reasonable because it was "hard to imagine how the facts of this case could have led a reasonable officer in Officer Gallo's position to suspect that Hartline was illicitly concealing drugs on her person."  Id. at 101.  The Hartline court emphasized that:

> Officer Gallo had no reason to believe that Hartline was under the influence of narcotics at the time of her arrest . . . nor did he see Hartline take any suspicious actions which might have suggested she was hiding something as he approached her vehicle.  Officer Gallo did not notice anything about Hartline's physical appearance that suggested she was secreting drugs on her person . . . Hartline answered every question that Officer Gallo asked her about drugs truthfully, yet Gallo did not even ask Hartline if she had any drugs on her person.  Furthermore, Hartline had been arrested for nothing more serious than a B-misdemeanor.

Id.; see also Foote v. Spiegel, 118 F.3d 1416, 1425 (10th Cir. 1997) ("[A] strip search of a person arrested for driving while under the influence of drugs . . . is not justified in the absence of reasonable suspicion that the arrestee has drugs . . . hidden on . . . her person. . . .  [T]his court expressly rejected the proposition that it is reasonable to strip search every inmate booked on a drug related charge."); Way v. Cnty. of Ventura, 445 F.3d 1157, 1162 (9th Cir. 2006) (holding that an arrest for misdemeanor drug offense does not support reasonable suspicion necessary to justify strip search).

While certainly not identical, the facts of the instant case are highly analogous.  Defendant never alleges that Plaintiff Ellsworth appeared to be under the influence of narcotics.  There is no evidence before the Court of suspicious behavior by Plaintiff Ellsworth beyond perhaps refusing to initially stop walking when called.  Further, Defendant has cited to nothing about Plaintiff

11

Ellsworth's physical appearance that might suggest that she was secreting drugs on her person. Indeed, the facts of this case support a reasonableness finding even less than those in Hartline. There, (1) the plaintiff was clearly in possession of narcotics; and (2) she had admitted that the narcotics were hers. Whereas, here, Plaintiff Ellsworth was one of three people found in the vicinity of narcotics.

> The Hartline court concluded that
>
> if the facts of this case amount to reasonable suspicion, then strip searches will become commonplace. Given the uniquely intrusive nature of strip searches, as well as the multitude of less invasive investigative techniques available to officers confronted by misdemeanor offenders, that result would be unacceptable in any society that takes privacy and bodily integrity seriously.

546 F.3d at 102. Based on the facts currently before it, the Court harbors similar concerns and cannot conclude as a matter of law that the strip search was reasonable.

### B. Probable Cause to Arrest

"To establish a claim for false arrest under 42 U.S.C. § 1983, a plaintiff must show that 'the defendant intentionally confined him without his consent and without justification.'" Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004) (quoting Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996)). "Because probable cause to arrest constitutes justification, there can be no claim for false arrest where the arresting officer had probable cause to arrest the plaintiff." Id. (citing Weyant, 101 F.3d at 852). "Probable cause to arrest exists when the arresting officer has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" Id. (quoting Weyant, 101 F.3d at 852). Further, "[t]he question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events

and the knowledge of the officers." Weyant, 101 F.3d at 852 (citations omitted).

"In order for the presence of contraband to constitute probable cause, it must be sufficient to 'lead a person of reasonable caution to believe that [the arrestee] was complicit in . . . [the] possession of [the contraband].'" Minter v. Cnty. of Westchester, 08 Civ. 7726, 2011 WL 856269, at *8 (S.D.N.Y. Jan. 20, 2011) (quoting United States v. Heath, 455 F.3d 52, 56 (2d Cir. 2006) (internal quotation and citation omitted; alterations in original)). "[A]n officer must have individualized probable cause to arrest an individual and that mere proximity to illegal conduct does not establish probable cause with respect to an individual." Dinler v. City of New York, 04 Civ. 7921, 2012 WL 4513352, at *11 (S.D.N.Y. Sept. 30, 2012) (citing Ybarra v. Illinois, 444 U.S. 85, 91 (1979); Rogers v. City of Amsterdam, 303 F.3d 155, 160 (2d Cir. 2002)).

Defendant's argument that probable cause existed and bars this claim is contained in two sentences in the Motion. Defendant contends that "plaintiffs do not contest the fact that contraband, i.e., heroin was found at the scene in close proximity to the plaintiffs. Clearly, this evidence supports probable cause for the arrest." Mot. at 11. Plaintiffs, however, argue that "[D]efendant has overlooked one critical detail in that the drugs were discovered as a part of an illegal search and seizure." Resp. at 15. "Specifically," Plaintiffs assert that "the arresting officers lacked the reasonable suspicion that was required prior to instructing the [P]laintiffs to stop and prior to pursuing the [P]laintiffs to the rear of the apartment building." Id.

Plaintiffs provide strong support for their contention that material issues of fact persist as to whether the officers had reasonable suspicion or probable cause to pursue Plaintiffs to the rear of the

13

apartment house or even to open the door to locate the heroin.[6]  Plaintiffs argument is, at its essence, that some version of the exclusionary rule or the "fruit of the poisonous tree doctrine" should vitiate any probable cause to arrest that Defendant might have had once she found the drugs because she should never have found the drugs.  This logic is compelling and is resonant in the context of motions to suppress evidence for criminal trials.  However, in the context of § 1983 suits for damages, the Second Circuit has roundly rejected this argument.

"Victims of unreasonable searches or seizures may recover damages directly related to the invasion of their privacy – including (where appropriate) damages for physical injury, property damage, injury to reputation, etc.; but such victims cannot be compensated for injuries that result from the discovery of incriminating evidence and consequent criminal prosecution."  Townes v. City of New York, 176 F.3d 138, 148 (2d Cir. 1999), cert. denied, 528 U.S. 964 (1999) (citing John C. Jeffries, Jr., *Damages for Constitutional Violations: The Relation of Risk to Injury in Constitutional Torts*, 75 VA. L. REV. 1461, 1475 (1989)).  Further, "[t]he lack of probable cause to stop and search does not vitiate the probable cause to arrest, because (among other reasons) the fruit of the poisonous tree doctrine is not available to assist a § 1983 claimant."  Id.; see also Miller v. City of New York, 11 Civ. 6663, 2012 WL 2524248, at *4-5 (S.D.N.Y. June 26, 2012); McDermott v. City of New York, 00 CIV 8311, 2002 WL 265127, at *6-7 (S.D.N.Y. Feb. 25, 2002).

Therefore, while the Court harbors serious doubts about the existence of probable cause or reasonable suspicion to take all of the steps that ultimately led to Defendant's finding the heroin,

---

[6] The Court notes that contrary to Defendant's characterization of the heroin sitting on the ground between Plaintiffs, Plaintiffs contend that the heroin was eventually located between the two doors of the apartment house.

these doubts are collateral to the existence of probable cause to arrest for § 1983 purposes.[7] Under the Second Circuit's holding in Townes, even if every action taken by Defendant up until the time at which she identified the heroin were unreasonable, Plaintiffs would have no cause of action for false arrest if Defendant had probable cause to arrest.

In this case, there is no question that heroin was found at the scene of the arrest. Even though there are factual disputes relating to the events leading up to the discovery of heroin, based on the undisputed facts and knowledge of the officers at the time of arrest[8] – *inter alia*, that the heroin was close to Plaintiffs; that the officers had been pursuing Plaintiffs; that Plaintiffs were preparing to enter a house that was known to the officers as being a locus for drug transactions – "a person of reasonable caution [would be led] to believe that [Plaintiffs were] complicit in . . . [the] possession of [the heroin]." Heath, 455 F.3d at 56 (internal quotations and citations omitted). Therefore, the Court grants Defendant's Motion for summary judgment on Plaintiffs' false arrest claims.

**C. Malicious Prosecution Claims**

Defendant contends that Plaintiffs' allegations and the undisputed facts fail to satisfy the elements of a cause of action for malicious prosecution. To state a claim for malicious prosecution under New York State law, a plaintiff must prove "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of

---

[7] While Plaintiff devotes substantial space in her Response to arguing about the validity and existence of the arrest warrant for Jessica Wiand, the Court concludes that under Townes this issue is irrelevant to the question of probable cause to arrest and therefore does not address these arguments.

[8] See Weyant, 101 F.3d at 852.

probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." Murphy v. Lynn, 118 F.3d 938 (2d Cir. 1997) (quoting Russell v. Smith, 68 F.3d 33, 36 (2d Cir. 1995); citing Broughton v. State, 37 N.Y.2d 451, 458 (1995), cert. denied, 423 U.S. 929 (1975) (internal quotation marks omitted)).

In addition to the finding that there was probable cause to arrest, the Court concludes that there is no basis on the record to conclude that actual malice motivated Defendant's actions. Indeed, Plaintiffs paint Defendant's actions not as the product of personal ill will or animus, but rather the result of official overreach and lack of regard for civil liberties. "The global picture here," allege Plaintiffs, "is that Officer Wachtel and Trooper Taylor chased these people down a driveway simply because they were getting out of a car. The officers never had any right to be anywhere near plaintiffs." Resp. at 18. Similarly, Plaintiffs assert that the strip search was not some cruel attempt to humiliate a helpless woman, but rather that it was a part of Defendants (unconstitutional) "standard protocol in drug related arrests." Id. at 14.

Even if elements of Defendant's conduct relating to Plaintiffs' arrest were unconstitutional, there is no basis for the Court to conclude that Defendant acted with the requisite *mens rea*, and contrary to Plaintiffs' assertions, there is no genuine issue of material fact as to the presence of malice. Therefore, the Court grants Defendant's Motion for summary judgment on Plaintiffs' malicious prosecution claim.

**D. Qualified Immunity**

The doctrine of qualified immunity protects government officials acting in their capacity from liability for civil damages as long as their conduct does not "violate clearly-established rights of which an objectively reasonable official would have known." Thomas v. Roach, 165 F.3d 137,

142 (2d Cir. 1999); see also Martinez v. Simonetti, 202 F.3d 625, 633-34 (2d Cir. 2000). However, a defendant may still be protected by qualified immunity if she violated an individual's constitutional rights, but "it was objectively reasonable [for her] to believe that their acts did not violate these clearly established rights." Amore v. Novarro, 624 F.3d 522, 530 (2d Cir. 2010) (quoting Cornejo v. Bell, 592 F.3d 121, 128 (2d Cir.2010)); see also Messerschmidt v. Millender, 132 S. Ct. 1235, 1245 (2012). As a matter of law, an officer is entitled to qualified immunity if

> "no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendant[ ]" to believe that he was acting in a fashion that did not clearly violate an established federally protected right.

Robison v. Via, 821 F.2d 913, 921 (2d Cir. 1987) (quoting Halperin v. Kissinger, 807 F.2d 180, 189 (D.C. Cir.1986)). The party invoking qualified immunity bears the burden of offering proof that it was objectively reasonable for her to believe that her actions did not violate clearly established rights and that she is entitled to qualified immunity. See Young v. Selsky, 41 F.3d 47, 54 (2d Cir. 1994).

"[F]or more than twenty years [the Second Circuit] has held that a misdemeanor arrestee may not be strip searched in the absence of individualized reasonable suspicion that she is secreting contraband." Hartline, 546 F.3d at 100 (citing, *inter alia*, Wachtler v. Cnty. of Herkimer, 35 F.3d 77, 81 (2d Cir. 1994); Walsh v. Franco, 849 F.2d 66, 68-69 (2d Cir. 1988)). Based on the similar facts in Hartline discussed *supra*, "a reasonable jury might determine that Defendants were acting in a fashion that clearly violated Hartline's Fourth Amendment rights." Id. at 103. Here, the Court similarly concludes that a reasonable jury might conclude that Defendant's strip search clearly violated Plaintiff Ellsworth's constitutional rights. Therefore, the Court concludes that Defendant is not entitled to summary judgment on the issue of qualified immunity for the strip search.

17

Because the Court grants Defendant's Motion for summary judgment with respect to Plaintiffs' claims for false arrest and malicious prosecution, the Court need not address any potential immunity for those causes of action.

### E. Personal Involvement

Defendant contends that the Court should grant summary judgment to her on all claims by Plaintiff Kimble because he has failed to show that she was personally involved in any of the constitutional violations that he alleges. Because the Court grants Defendant's Motion for summary judgment on the merits of both claims by Plaintiff Kimble, the Court need not address the issue of Defendant's personal involvement in the alleged violations of Plaintiff Kimble's constitutional rights.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendant's Motion (Dkt. No. 15) for summary judgment is **GRANTED in part** and **DENIED in part**, consistent with this Memorandum-Decision and Order; and it is further

**ORDERED**, that Defendant's Motion (Dkt. No. 15) seeking summary judgment on the strip search claim by Plaintiff Ellsworth is **DENIED**; and it further

**ORDERED**, that Defendant's Motion (Dkt. No. 15) seeking summary judgment on Plaintiffs' false arrest claims is **GRANTED**; and it is further

**ORDERED**, that Defendant's Motion (Dkt. No. 15) seeking summary judgment on Plaintiffs' malicious prosecution claims is **GRANTED**; and it is further

**ORDERED**, that Defendant's Motion (Dkt. No. 15) seeking summary judgment on the issue

of qualified immunity for the strip search of Plaintiff Ellsworth is **DENIED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties.

**IT IS SO ORDERED**.

DATED: January 11, 2013
Albany, New York

Lawrence E. Kahn
U.S. District Judge